UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHANE CAMPBELL GALLERY, INC., on behalf of itself and all others similarly situated,<br><br>      Plaintiff,<br><br>  v.<br><br>FRIEZE EVENTS, INC.,<br><br>      Defendant. | Case No. 18-cv-5134<br><br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Shane Campbell Gallery, Inc., by its attorneys, brings this class action against Frieze Events, Inc. ("Frieze"), on its own behalf and on behalf of all others similarly situated, and alleges as follows:

## I. INTRODUCTION

1. This is a class action filed on behalf of hundreds of art galleries and other persons ("Exhibitors") who paid substantial sums to participate in the 2018 Frieze Art Fair held on Randall's Island in New York. Defendant Frieze, in form written contracts, promised each Exhibitor, among other things, to "use commercially reasonable efforts to provide common area … air conditioning." Defendant breached this contractual promise by failing to properly design, specify, test, commission, supervise, and regulate the ability of the air conditioning system at the Art Fair to maintain an environment within which Exhibitors could reasonably conduct commercial business. Defendant has admitted it was aware in advance of an impending heatwave with expected "record-breaking temperatures" but was negligent in preparing the site for such heat and ensuring a reasonably performing air conditioning system. As a direct result of the oppressive

1

heat and unworkable interior climatic conditions, art customers, collectors, consultants and their clients and other attendees could not remain in the site and were forced to leave. As such, the Exhibitors were prevented from engaging in their commercial endeavors and suffered substantial financial losses. This lawsuit seeks rescission of the contracts the Exhibitors signed with Frieze, and reimbursement of all sums paid for participation at the Art Fair.

## II.  JURISDICTION AND VENUE

2. This Court has personal jurisdiction over the parties in this case.

3. Plaintiff is a citizen of Chicago, Illinois.

4. This Court has personal jurisdiction over Frieze Events, Inc. because it is a New York corporation that intentionally avails itself of the laws of this State through its staging of the Frieze Art Fair held from May 2, 2018 to May 5, 2018, at Randall's Island Park, New York, NY., so as to render the exercise of jurisdiction by this Court consistent with traditional notions of fair play and substantial justice.

5. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Jurisdiction under CAFA is met because the proposed number of putative class members exceeds 100, at least one plaintiff and one defendant are citizens of different states, and the amount in controversy, including, but not limited to the aggregate amount of relief sought by absent class members, exclusive of interest and costs, exceeds $5 million.

6. Venue is proper in this District under 28 U.S.C. § 1391(a). Substantial acts in furtherance of the alleged improper conduct, including Frieze's breach of its contracts with Plaintiff and Class members occurred within this District.

7. No other forum would be more convenient for the parties and witnesses to litigate this action.

### III. PARTIES

8. Plaintiff Shane Campbell Gallery, Inc. is a corporation that is a citizen of the State of Illinois with a place of business located at 2021 S. Wabash Avenue, Chicago, IL 60616.

9. Defendant Frieze is a New York corporation with a principal place of business located at 247 Centre Street, 5th Floor, New York, NY 10013.

### IV. FACTUAL ALLEGATIONS

10. The Frieze Art Fair ("Fair") is an art fair that has been held in New York every May since 2012. In 2018, the Fair was scheduled to take place at Randall's Island Park from May 2, 2018 through May 5, 2018

11. Plaintiff Shane Art Gallery has applied and been accepted to participate in the Fair each year since its inception.

12. For 2018, Frieze advertised to galleries and artists as follows: "Introducing a fresh layout, new curators, and programs, Frieze New York 2018 brought together more than 190 galleries from 30 countries, showcasing the world's most significant artists, a series of talks, and the city's most talked about restaurants, all in a bespoke structure in Randall's Island Park."

13. The new structure for the Fair utilized by Frieze differed in significant respects from prior venues. In particular, instead of one long, snaking tent, Frieze installed many separate tents forming discrete sections. The air conditioning vents that had previously been located on the floor were relocated to the upper levels of the tents.

14. Plaintiff entered into a contract entitled "Exhibition Terms and Conditions" (the "Contract") with Frieze to become an Exhibitor at the Fair. A copy of the Contract is attached hereto as **Exhibit A**.

15. The Contract is a standard form contract used by Frieze in each transaction with

members of the Class.

16. Frieze entered into the Contract with approximately 190 Exhibitors from the United States and dozens of other countries for the Fair. Each Exhibitor paid Frieze approximately $78.50 per square foot for booths ranging from approximately 431 to 1,292 square feet to participate in the Fair. Frieze also charged a surcharge of up to 15% for "privileged locations" such as corner booths and booths on the open squares.

17. The Contract provided, *inter alia*, as follows:

    a. Exhibitors were prohibited from participating in any other fairs located in New York for the duration of the Fair, Contract at ¶ 7;

    b. Exhibitors were required to keep their booths sufficiently manned during the time the Fair was open, *id.*;

    c. Frieze had the sole and absolute discretion to place the location of each Exhibitor's booth at the Fair, *id.* at ¶ 9;

    d. Frieze had the right to enter any part of the Fair premises at any time to execute work or repairs, or for other purposes, *id.*;

    e. Frieze agreed to use commercially reasonable efforts to provide common area air conditioning, *id.* at ¶ 18;

    f. Exhibitors were prohibited from installing their own power or connection, *id.*

18. Weather forecasts prior to the beginning of the Fair indicated the weather would be hot and sunny with temperatures approaching the high 80s degrees.

19. According to Accuweather, the outdoor temperature on Randall's Island reached 90 degrees on May 2; 93 degrees on May 3; and, 84 degrees on May 4, 2018.

20. The temperatures on May 2 and 3, 2018 broke daily record highs. *See* https://www.weather.gov/media/okx/Climate/Almanacs/nyc/nycmay.pdf (Central Park, NY Historical Data, Monthly Almanacs) (last visited March 3, 2020).

21. Frieze failed to properly design, test and regulate the ability of the air conditioning system at the Fair to adequately maintain an environment within which to conduct commercial business.

22. Frieze failed to use commercially reasonable efforts to design, specify, construct, test and regulate the air conditioning system in the following ways:

    a. by failing to use a sufficiently qualified and skilled independent HVAC designer or engineer to design and/or specify an air conditioning system to adequately cool the event space; and/or

    b. by failing to properly design, specify, test, commission, supervise and take responsible charge and complete expected professional due diligence to provide the necessary blueprints and other documentation for a properly operating and performing air conditioning system to the company that was hired to design, construct, test, regulate and/or install the air conditioning system; and/or

    c. by failing to take into consideration the known weather forecast for the days of the event when designing the air conditioning system; and/or

    d. by failing to design, construct, test, regulate and/or install an air conditioning system that would sufficiently provide cooling for temperatures reaching 93 degrees Fahrenheit; and/or

    e. by failing to take into consideration the expected and foreseeable seasonal solar insolation (solar energy gain) when designing/specifying the subject air conditioning system;

and/or

   f. by failing to take into consideration the cooling load that would be generated by the internal heat gain of lighting systems used in the event space in designing the air conditioning system; and/or

   g. by failing to take into consideration the cooling load that would be generated by providing fresh outdoor air (sensible and latent) in the amounts of 15-30 cubic feet per minute (or more) per person as mandated by applicable codes and/or good engineering practice; and/or

   h. by failing to take into consideration the cooling load that would be generated by exhausting air (sensible and latent) in the amounts as mandated by applicable codes and/or good engineering practice; and/or

   i. by failing to take into consideration the cooling load (sensible and latent) that would be generated by the scientifically established data for internal heat gain from each person and the historic data on the previous attendance and established occupancy loads in the event space in designing the air conditioning system; and/or

   j. by failing to take into consideration the cooling load that would be generated by the electrical and/or mechanical equipment in the event space in designing the air conditioning system; and/or

   k. by failing to take into consideration the additional cooling load for solar gain that would occur with the particular material used to construct the tent; and/or

   l. by failing to provide sufficient generating capacity and power quality (proper voltage, frequency, and within manufacturer's quality standards) of electric generators to provide power for the air conditioning systems including but not limited to: chilled water systems,

direct expansion units, blowers, air handlers, pumps and/or other HVAC equipment; and/or

      m.     by failing to order and install sufficient chilled water systems or other air conditioning equipment to adequately cool the event space; and/or

      n.     by failing to order and install sufficient air handlers to adequately cool the event space; and/or

      o.     by failing to order and install sufficient direct expansion units to adequately cool the event space; and/or

      p.     by failing to order and install sufficient flexible hosing to adequately deliver cool air generated by the installed equipment; and/or

      q.     by failing to order and install sufficient ducting to adequately deliver cool air generated by the installed equipment in sufficient volumetric air flow; and/or

      r.     by failing to order and install sufficient humidity, climate, and thermostatic controls in the event space to properly control the HVAC equipment; and/or

      s.     by failing to design a method for distribution of air in volumetric flow consistent with well established design and good engineering practice; and/or

      t.     by failing to design a method for sufficiently delivering cool air generated by the installed equipment to the event space, e.g. by way of floor vents as was done in the past to adequately cool the space, and instead using ducts along the ceiling; and/or

      u.     by failing to provide sufficiently qualified personnel and/or HVAC technicians to monitor the air conditioning system during the event and make necessary corrections of the deficiencies; and/or

      v.     by failing to construct the tent(s) properly to prevent unwanted air infiltration; and/or

    w. by failing to comply with New York City Building Code section 1204.2 which states that interior spaces intended for human occupancy that are provided with air conditioning shall be provided with active or passive systems that are capable of maintaining 78 degrees Fahrenheit at 50% relative humidity when the outdoor temperature is 89 degrees Fahrenheit; and/or

    x. by failing to comply with applicable standards established by the American Society of Heating, Refrigerating, and Air Conditioning Engineers (ASHRAE), or other standards of good engineering practice; and/or

    y. by failing to run the system full time so as to allow the event space to reach a sufficient temperature to remain cool throughout the daytime hours; and/or

    z. by failing to sufficiently supplement the air conditioning system during the event with commercial portable air conditioners when it became evident that the system, as designed, was incapable of adequately cooling the event space.

23. Within the first hour of the opening day, the heated temperatures in the tent were oppressive.

24. Frieze was aware of the problem but took no action to correct it.

25. The temperature continued to rise, to the point that many Exhibitors, their staff, other attendees such as collectors, consultants and curators were unable to bear the heat and were forced to exit the tent.

26. Collectors and consultants who had made appointments with Plaintiff to visit its exhibit notified Plaintiff that they could not stay there due to the heat; others never even kept their appointments.

27. Many people became ill from the conditions.

28. Frieze did not adequately respond to the problems resulting from the high temperatures within the tent and breached its obligation to use commercially reasonable efforts to provide common area air conditioning.

29. Frieze's breach resulted in damages incurred by Plaintiff and other Exhibitors. Plaintiff and other Exhibitors all paid substantial fees to Frieze in consideration of obtaining exhibit space to conduct their businesses.

30. Following the conclusion of the Fair, Plaintiff sought to negotiate a return of all fees paid to Frieze in connection with their participation in the Fair.

31. In response, Frieze offered to return five percent (.05%) of the fees that Plaintiff had paid.

32. Frieze's offer is insufficient to compensate Plaintiff and other Exhibitors for Frieze's failure to use commercially reasonable efforts to provide common space air conditioning and its negligence as described above.

## V.     CLASS ALLEGATIONS

33. Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all other similarly situated art galleries and individuals who entered into the Contracts with Frieze to participate in the Fair that took place in Randall's Island Park from May 2, 2018 through May 5, 2018 (the "Class").

34. Excluded from the Class are counsel for the parties, the judges assigned to this case and the members of their immediate families, officers and directors of Frieze; members of the immediate families of the officers and directors of Frieze; Frieze's legal representatives, heirs, successors, or assigns; and any entity in which they have or have had a controlling interest.

35. Plaintiff seeks to certify the Class pursuant to Federal Rules of Civil Procedure

23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

36. At this time, Plaintiff does not know the exact number of the Class members. Plaintiff alleges that there were approximately 190 Exhibitors participating in the Fair. Plaintiff believes that members of the Class are so numerous that joinder of all members is impracticable.

37. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include whether Frieze breached the Contract with Plaintiff and members of the Class.

38. Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, sustained damages from Frieze's wrongful conduct.

39. Plaintiff will fairly and adequately protect the interests of the Class because Plaintiff is similarly situated with, and has suffered similar injuries as, the members of the Class it seeks to represent. Plaintiff is an adequate representative of the Class because its interests do not conflict with the interests of the Class members it seeks to represent, and it has retained counsel competent and experienced in conducting complex class action litigation. Plaintiff has no interests adverse to those of the Class members and will vigorously prosecute this litigation.

40. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. No Class member has a substantial interest in individually controlling the prosecution of a separate action.

41. The prerequisites to maintaining a class action for injunctive or equitable relief are met as Frieze has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

42. Upon information and belief, there are no pending lawsuits concerning the products

at issue in this case. Concentration of the litigation concerning this matter in this Court is desirable, and the difficulties likely to be encountered in the management of a class action are not great. The resolution of the claims of all Class members in a single forum, and in a single proceeding, would be a fair and efficient means of resolving the issues raised in this litigation.

43. The prosecution of separate actions by Class members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Frieze.

44. Frieze's conduct is generally applicable to the Class as a whole and Plaintiff seeks remedies with respect to the Class as a whole. As such, Frieze's systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

45. The Class is specifically identifiable to facilitate provision of adequate notice and there will be no significant problems managing this case as a class action. Notice to the Class can be made through various means, such as in-store leaflets, website notices, Facebook notices, notices on the labels of the packages, and/or direct notice to those consumers for which Frieze knows the e-mail or physical mailing address.

## VI.    CAUSES OF ACTION

### COUNT 1

### Breach of Contract

46. Plaintiff re-alleges the foregoing allegations as if set forth in full herein.

47. Frieze entered into the Contract with Plaintiff and other members of the Class.

48. The Contract set forth affirmations of fact or promises by Frieze relating to the Fair and became part of the basis of the bargain.

49. Plaintiff and members of the Class entered into the Contract. Plaintiff and each member of the Class paid substantial sums to Frieze in exchange for participating in the Fair as an

Exhibitor.

50. Frieze breached the Contract. This breach resulted in damages to Plaintiff and other members of the Class, who did not receive the services promised by Frieze.

51. As a proximate result of the breach of the Contract by Frieze, Plaintiff and the other members of the Class did not receive the services promised in return for the substantial sums they paid to Frieze to participate in the Fair. Plaintiff and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial. Among other things, Plaintiff and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment on behalf of itself and the proposed Class providing such relief as follows:

A. Certification of the Class proposed herein under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3); appointment of Plaintiff as Class representative; and appointment of the undersigned counsel as counsel for the Class;

B. A declaration that Frieze is financially responsible for notifying members of the Class of the pendency of this suit;

C. Rescission of the Contracts that Plaintiff and Class members entered into with Frieze;

D. An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Frieze as a result of the breach of contract alleged herein;

E. Restitution, disgorgement, refund, and/or other monetary damages, together with costs and disbursements, including reasonable attorneys' fees pursuant to the applicable statutes

and prejudgment interest at the maximum rate allowable by law;

F.   Punitive damages in accordance with proof and in an amount consistent with applicable precedent; and

G.   Such further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff and the Class members hereby demand a trial by jury.

DATED: March 5, 2020   *s/ Lewis J. Saul*
Lewis Saul & Associates, P.C.
Lewis J. Saul
Edward A. Coleman (*pro hac vice*)
29 Howard Street, 3rd Floor
New York, NY 10013
T: (212) 376-8450
F: (212) 376-8447
lsaul@lewissaul.com
ecoleman@lewissaul.com

**FRANCIS MAILMAN SOUMILAS, P.C.**
James A. Francis (*pro hac vice*)
David A. Searles (*pro hac vice*)
1600 Market Street, Suite 2510
Philadelphia, PA 19103
Tel. (215) 735-8600
Fax. (215) 950-8000